IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNIVERSITY ACCOUNTING SERVICE, LLC**,<br><br>Plaintiff,<br><br>v.<br><br>**ETHAN SCHULTON and SCHOLARCHIP CARD, LLC**,<br><br>Defendants. | Case No. 3:18-cv-1486-SI<br><br>**OPINION AND ORDER ON SCHOLARCHIP'S MOTION FOR SUMMARY JUDGMENT** |

Allyson B. Baker, Sameer P. Sheikh, Erin Z. Cass, and Michael J. Marusak, VENABLE LLP, 600 Massachusetts Avenue, NW, Washington, DC 20001; Ciaran P. A. Connelly, BALL JANIK LLP, 101 SW Main Street, Suite 1100, Portland, OR 97204. Of Attorneys for Plaintiff.

Scott R. Ast, SCHARNHORST AST KENNARD GRIFFIN PC, 1100 Walnut Street, Suite 1950, Kansas City, MO 64106; Stephen P. Yoshida and Michael J. Farrell, MB LAW GROUP LLP, 117 Taylor Street, Suite 200, Portland, OR 97204. Of Attorneys for Defendant Ethan Schulton.

Stephen Nakamura, MERLE BROWN & NAKAMURA PC, 90 Broad Street, Suite 2201, New York, NY 10004; John C. Rothermich, K&L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97258. Of Attorneys for Defendant ScholarChip Card, LLC.

**Michael H. Simon, District Judge.**

Defendant ScholarChip Card, LLC ("ScholarChip") moves for summary judgment against all claims asserted against ScholarChip by Plaintiff University Accounting Service, LLC ("UAS"). For the reasons that follow, the Court denies ScholarChip's motion.

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

**BACKGROUND**

Plaintiff UAS is a student loan servicing company and a wholly owned subsidiary of Transworld Systems, Inc. ("TSI"), a debt collection and receivables management company. The customers of UAS are lenders who provide student loans. UAS assists its customers by documenting when student loan payments are made, ensuring that loan balances are accurately tracked, and maintaining loan documents.

Defendant ScholarChip is a technology company that provides software development and data security services. Dr. Maged Atiya ("Dr. Atiya") founded ScholarChip in 2000 and currently is its Chief Technology Officer ("CTO"). Defendant Ethan Schulton ("Schulton")

worked for ScholarChip from 2003 through the end of 2017, when he resigned. At the time of his resignation, Schulton was one of the leading software developers at ScholarChip.

On May 31, 2006, UAS entered into three contracts with ScholarChip. They are referred to as: (1) the Master Terms and Conditions ("MTC"); (2) the Software Development Agreement ("SDA"); and (3) the Hosting Support Services Agreement ("HSSA") (collectively, the "Agreements"). Through the Agreements, UAS hired ScholarChip to create for UAS a unique, proprietary software platform ("eUAS Software") and to host data provided to or accessed by ScholarChip for the benefit of UAS and its customers ("Client Data"). Client Data is described in the MTC as "including but not limited to all reports provided by ScholarChip" to UAS concerning services such as hosting, maintenance, and support services. The MTC also includes confidentiality provisions requiring, among other things, that ScholarChip "shall take appropriate action, by instruction to or agreement with its employees," to maintain the confidentiality of confidential information including all information defined under the MTC as "Confidential Information."

Under the MTC, UAS's Confidential Information includes "customer lists, customer and supplier identities and characteristics, agreements, marketing knowledge and information, sales figures, pricing information, marketing plans and business plans." MTC § 8.2. ScholarChip must use the Confidential Information and the Client Data solely for the purpose of performing its obligations under the Agreements. MTC § 8.3. To the extent ScholarChip discloses Confidential Information to "persons in its organization who have a need to know for purposes of performing the [Agreements] or for a purpose consistent with the terms of the [Agreements]," such disclosure must be "then only pursuant to an agreement that such persons will maintain the

Confidential Information or Client Data in confidence and will not use or disclose to others except in accordance with this paragraph." MTC § 8.3.[1]

Schulton was one of the principal software developers at ScholarChip and was the chief architect of the eUAS Software. His responsibilities included developing, coding, and maintaining the eUAS Software, responding to questions and requests from UAS and its customers, and ensuring the security and safekeeping of UAS's Client Data and Confidential Information. Schulton was UAS's primary contact at ScholarChip for all technical needs and questions or requests relating to the eUAS Software. In addition, Schulton was responsible for providing "webinars," or personalized tutorial sessions, to UAS's customers to educate them about the features of the eUAS Software, provide technical support to UAS's customers, and answer customer-specific questions. UAS entrusted ScholarChip and its employees, including Schulton, with access to UAS's Client Data and Confidential Information, including customer lists, customer preferences, and other customer-specific intelligence that Schulton was exposed to while providing eUAS webinars and other tasks.

---

[1] ScholarChip asserts that the SDA expired on May 31, 2009, and the HSSA expired on May 31, 2011. ScholarChip does not contend that the MTC has expired. ScholarChip adds that it continued to provide services to UAS under a series of interim agreements. Under the SDA, "UAS shall have full and exclusive ownership rights to the eUAS Software, including but not limited to source code." SDA § 1.6. The SDA further provides: "Notwithstanding the expiration or termination of this Development Agreement for any reason, Client's [UAS's] rights to the eUAS Software shall continue in effect perpetually." SDA § 2. Similarly, the MTC provides: "No termination of the Development Agreement [SDA] or any of the Covered Agreements shall terminate Client's rights to the eUAS Software and Warranty Services, which rights shall continue in effect notwithstanding the termination of the Covered Agreements." MTC § 10.3. ScholarChip contends, however, that the SDA obligated ScholarChip to achieve certain software development milestones, that ScholarChip achieved all of those milestones by 2012, that the SDA required certain payments by UAS to ScholarChip for achieving the milestones, and that UAS has not paid ScholarChip for achieving those milestones and owes ScholarChip $240,000. ScholarChip asserts that because UAS has not fully paid ScholarChip, UAS does not own the eUAS Software.

According to ScholarChip, in March 2015, TSI (UAS's parent company) told ScholarChip that TSI wanted ScholarChip to split the eUAS student loan servicing business into its own unit that would then contract directly with TSI. In September 2015, TSI informed ScholarChip that it no longer wanted to pursue the proposal discussed in March. Instead, TSI told ScholarChip, TSI and UAS wanted to separate from ScholarChip and to have ScholarChip move, or migrate, the loan servicing platform into TSI's own date center.

In December 2015, as an interim pricing agreement was about to expire, UAS requested a price extension through the end of 2016. Dr. Atiya told UAS that ScholarChip would only consider a price extension through the end of 2016 in the context of a transition agreement. The parties, however, did not reach an agreement on new rates, and, according to ScholarChip, the interim pricing agreement expired on December 31, 2015. ScholarChip adds that in January 2016, TSI suggested to ScholarChip that it send UAS a notice of ScholarChip's intent to cease providing any further loan servicing services to UAS. On February 3, 2016, ScholarChip sent a notice to UAS, stating that ScholarChip would cease servicing UAS's loan portfolio on June 30, 2016. According to UAS, in February 2016 ScholarChip told UAS that it would have to pay higher fees if it wanted to continue using the eUAS Software; otherwise, UAS's access would be terminated. ScholarChip later agreed to postpone the termination date.

On March 29, 2016, Schulton sent an email to ScholarChip's founder and CTO Dr. Atiya stating, among other things: "To ensure UAS/TSI has no fuel for a lawsuit, should we provide them with the source code now?" During the following month, April 2016, Schulton sent an email to his legal counsel, and copied others within ScholarChip. Schulton discussed his plan to form a new legal entity, "Online Financial Management Technologies, LLC." In July 2016, ScholarChip and UAS entered into a new pricing agreement through March 2017.

In late 2016, Tuition Management Systems ("TMS"), a competitor of UAS, approached ScholarChip about using ScholarChip's loan servicing platform to host TMS's clients' student workout plans for a single university. According to ScholarChip, it created a test environment using simulated data to determine whether the eUAS platform could service TMS's proposed student workout plan and considered demonstrating this test environment to TMS. Also according to ScholarChip, after internal testing ScholarChip abandoned the idea of using portions of the eUAS platform for workout plans for any entity, including TMS. Thereafter, this potential product was never marketed or sold, and ScholarChip asserts that it did not entertain any use of the eUAS platform for any services other than those being provided to UAS. In November 2016, ScholarChip proposed to UAS that they enter into a new agreement under which ScholarChip would compete directly with UAS using the eUAS Software. UAS did not agree, and the parties did not adopt ScholarChip's proposal.

In February 2017, UAS and ScholarChip met, and UAS explained that it had identified an alternative platform and intended to move, or migrate, its Client Data away from ScholarChip. ScholarChip then demanded from UAS an increase in fees for allowing UAS to migrate its Client Data. In March 2017, Schulton declined a request from UAS to perform certain software development work relating to eUAS. Schulton told UAS that the requested modifications were no longer available to UAS. By letter dated March 27, 2017, ScholarChip advised UAS that ScholarChip would continue to provide services to UAS only through December 31, 2017.

In June 2017, UAS filed a lawsuit against ScholarChip in federal court in the Eastern District of Wisconsin. Also in June, ScholarChip limited UAS's access to the eUAS Software by terminating UAS's access to a development and test environment that UAS contends was necessary for UAS to test features and ensure the eUAS system was functioning properly for

UAS's customers. The federal court in Wisconsin dismissed UAS's lawsuit in October 2017 for lack of personal jurisdiction. Also in October 2017, ScholarChip filed its own lawsuit against UAS and TSI in federal court in the Eastern District of New York. In that action, ScholarChip alleges that UAS failed to make certain payments for work that ScholarChip asserts it performed relating to the milestones. UAS disputes ScholarChip's allegations and asserts counterclaims. The litigation in New York is continuing.

In the New York litigation, UAS served a subpoena for documents on Schulton, among others. On March 13, 2018, Dr. Atiya sent an email to Shulton stating, among other things: "You will need NOT to produce any of the documents they requested since ScholarChip produced such documents on your behalf." ECF 154-26. Three days later, on March 16, 2018, Schulton sent an email to Damani Sims, legal counsel for ScholarChip. Schulton copied Dr. Atiya and others at ScholarChip. In his email, Schulton stated that he intended to "proceed with building a new loan servicing system from the ground up so as to avoid any accusations of intellectual property theft or copyright infringement." ECF 154-25 at 1. Shulton added he "left ScholarChip with only the knowledge gained over the last 15 years of employment. I have no ScholarChip source code or system design documentation." *Id*. As discussed in the Court's Opinion and Order on Plaintiff's Motion for Sanctions (ECF 159), Shulton's statements were not accurate, based on the fact that Shulton took with him a substantial quantity of UAS's Confidential Information when he left ScholarChip seven months earlier, at the end of 2017. Shortly after Shulton sent his email on March 16, Sims responded on behalf of ScholarChip, stating:

> Our discussions will not encroach upon your endeavor to build a new loan servicing system. We would like to speak with you about ScholarChip's claims against TSI and UAS, TSI and UAS's counterclaims against ScholarChip, *and responding to the subpoenas*.

ECF 154-25 at 1 (emphasis added).

On July 30, 2018, Schulton sent an email to both UAS and Dr. Atiya. In that email, Schulton stated his intent to create a loan servicing system that would compete directly with UAS. He further said that he would create the system based on knowledge acquired during his 15 years at ScholarChip. Schulton added that he would be communicating with and soliciting business from UAS's customers that he learned about through his work at ScholarChip for UAS. Schulton explicitly named three customers and individuals on UAS's customer list who served as UAS's direct point of contact at each of the customer companies. The subject line of Schulton's email of July 30 was "some needed competition."

In August 2018, UAS filed this lawsuit in the District of Oregon against Schulton and ScholarChip. As its first claim, UAS alleges that ScholarChip breached its contractual obligations based on Schulton allegedly taking, using, and disclosing UAS's Confidential Information and the eUAS Software. UAS further contends that ScholarChip failed to institute or enforce a non-disclosure and confidentiality agreement with Schulton sufficient to protect UAS's Confidential Information. UAS also alleges that ScholarChip breached its contractual obligations by assisting, facilitating, or encouraging Schulton's improper actions. As its second claim, UAS alleges that both ScholarChip and Schulton violated Oregon's Uniform Trade Secrets Act, Or. Rev. Stat. § 646.461, *et seq*. As its third claim, UAS alleges that both ScholarChip and Schulton committed the tort of intentional interference with economic relations, specifically UAS's relationships with its own customers for loan servicing. ScholarChip moves for summary judgment against all three claims asserted by UAS.

## DISCUSSION

**A. Breach of Contract**

Section 8 of the MTC sets forth the parties' "Confidentiality and Non-Disclosure Obligations," which "shall continue in effect after the termination or expiration of the Covered

Agreements." MTC § 8.3. Section 8.3 also provides: "ScholarChip shall exercise at least the same degree of care to safeguard the confidentiality of Client's Confidential Information or Client Data as it does to safeguard its own proprietary confidential information, but not less than a reasonable degree of care." ScholarChip argues that its "extensive, industry-accepted efforts" to protect UAS's confidential information more than satisfy the "reasonable care" required by the MTC and that UAS has not presented any evidence to support its claim that ScholarChip's protocols were unreasonable.

As noted in the Court's Opinion and Order on Plaintiff's Motion for Sanctions (ECF 159), Schulton, while in the employ of ScholarChip and serving as the lead software developer at ScholarChip for eUAS, downloaded to his personal computer and cloud storage (including his personal DropBox account) numerous emails and other data from ScholarChip, including a screenshot of the results of a query listing UAS's private loan customers ordered by revenue ("Private Client List"). Schulton also admits to taking copies of recorded webinars, which were personalized tutorial sessions with UAS's customers. During these customer-specific webinars, UAS's customers and Schulton discussed specific customer needs and priorities, and Schulton answered customer-specific questions. Schulton also admitted to attempting to hide from UAS the fact that he copied all this confidential material, including ScholarChip emails, webinar recordings, and UAS's Private Client List ordered by revenue, while working for ScholarChip and then took it with him after he left ScholarChip. These facts, viewed in the light most favorable to UAS as the non-moving party and drawing all reasonable inferences in favor of UAS, could lead a rational trier of fact to find that ScholarChip breached its contractual obligations under § 8.3 by failing to exercise "a reasonable degree of care" to "safeguard the

confidentiality of Client's Confidential Information." ScholarChip's motion for summary judgment against UAS's claim alleging breach of contract is denied.

## B. Misappropriation of Trade Secrets

To establish a claim of misappropriation of trade secrets under Oregon's Uniform Trade Secrets Act, a plaintiff must establish three elements: (1) the information that is the subject of the misappropriation claim must qualify as a trade secret under the Oregon statute; (2) the plaintiff must have employed reasonable measures to maintain the secrecy of its information; and (3) the conduct of the defendant must constitute misappropriation under the statute. *Acrymed, Inc. v. Convatec*, 317 F. Supp. 2d 1204, 1217 (D. Or. 2004) (citing *W. Med. Consultants v. Johnson*, 835 F. Supp. 554, 557 (D. Or. 1993), *aff'd* 80 F.3d 1331 (9th Cir. 1996)); *see also Pelican Bay Forest Prods., Inc. v. W. Timber Prods., Inc.,* 297 Or. App. 417, 427-28 (2019).

Oregon's Uniform Trade Secrets Act defines "trade secret" as "information . . . that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Or. Rev. Stat. § 646.461(4). UAS asserts that the trade secrets at issue consist of UAS's

> customer lists, records, points of contact at customer companies, and information pertaining to its customer relationships, marketing insights and strategies, and nonpublic business development information, including customer specific preferences as to loan servicing features and system modifications.

ECF 1 at ¶ 64 (Complaint).

ScholarChip argues that UAS has not presented any evidence that its claimed trade secrets meet the statutory definition of trade secret. ScholarChip notes that UAS has admitted that the names of its clients are publicly known. Thus, according to ScholarChip, UAS's customer lists cannot be trade secrets. ScholarChip also argues that UAS presents no evidence

that UAS's other claimed trade secrets are anything more than "general business knowledge," which is not protectable trade secret information.

ScholarChip may be correct that the specific names of UAS's clients are publicly known and thus do not, by themselves, constitute a trade secret under Oregon law. UAS, however, presents evidence of other forms of protected trade secrets, such as customer-specific preferences and priorities for eUAS functionality as discussed during the recorded webinars and copies of which were taken by Schulton. UAS also contends that the Private Client List taken by Schulton, which identifies UAS's loan customers ordered by revenue, is a trade secret. UAS further asserts that the eUAS source code is a trade secret under Oregon law.

ScholarChip's only response as to why these items are not trade secrets is that there is no evidence that these items are more than general business knowledge. The Court finds that, when viewed in the light most favorable to UAS as the non-moving party, these items contain information that derive independent economic value, actual or potential, from not being generally known to the public. If they did not, there would be no reason why Schulton would have taken them with him when he left his employment at ScholarChip. Further, competitors generally do not possess the type of granular information that appear to be embodied in these purported trade secrets, including customer lists ordered by revenue and customer-specific needs and priorities contained in the recorded webinars. Thus, a rational finder of fact could conclude that this information gives UAS a potential business advantage sufficient to qualify as a trade secret.

ScholarChip also argues that there is no evidence of misappropriation by ScholarChip. In response, UAS argues that there is a genuine dispute on whether ScholarChip demonstrated the features of the eUAS Software to TMS and whether ScholarChip provided TMS with a list of

UAS's customers ordered by revenue. In addition, Shulton has admitted taking electronic copies of recorded webinars with UAS's customers, the Private Client List of UAS's customers ordered by revenue, and a large file of emails when he left ScholarChip. For ScholarChip to be responsible for Schulton's misappropriation of UAS's trade secrets, however, there must be evidence showing that ScholarChip facilitated or encouraged Schulton in doing so. Although the evidence presented by UAS on this point is modest, it is more than a mere scintilla.

At least by March 2018, ScholarChip knew that Schulton intended to establish (or at least was considering establishing) a loan servicing business to compete with UAS. ScholarChip also knew that Schulton had received a document subpoena from UAS in connection with the New York litigation. Yet, on March 13, 2018, Dr. Atiya stated to Schulton, then a *former* employee: "You will need NOT to produce any of the documents they requested since ScholarChip produced such documents on your behalf." ECF 154-26. There may be an entirely innocent explanation for Dr. Atiya advising *former* employee Schulton not to respond to a subpoena personally served on Schulton. But there also may be a less innocent explanation. Viewing all reasonable inferences in favor of UAS, which the Court must do at this stage of the litigation, at the time Dr. Atiya sent his email to Schulton, Dr. Atiya appears to have known that Shulton had taken electronic copies of UAS's trade secrets, and Dr. Atiya was attempting to assist Shulton in preventing UAS from discovering that fact. (How else would Dr. Atiya have known that former employee Schulton had possession of documents to produce to UAS and that ScholarChip had already produced to UAS copies of those specific documents? There may be an innocent answer, but at this stage of the lawsuit all reasonable inferences must be drawn in favor of UAS.) These are matters best left to resolution by the jury at trial than resolved by the Court at summary

judgment. ScholarChip's motion for summary judgment against UAS's claim alleging misappropriation of trade secrets is denied.

## C. Intentional Interference with Economic Relations

Under Oregon common law, a claim alleging intentional interference with economic relations requires proof of six elements: (1) the existence of a business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the relationship; and (6) damages. *Allen v. Hall*, 328 Or. 276, 281 (1999). ScholarChip argues that UAS's third claim fails because UAS cannot show that ScholarChip acted through improper means or for an improper purpose, is a third party to UAS's relationships with its customers, or caused damage to UAS.

### 1. Improper Means or Purpose

For UAS to succeed in its claim for intentional interference, UAS must show interference that is "wrongful by some measure beyond the fact of the interference itself." *Straube v. Larson*, 287 Or. 357, 361 (1979) (quotation omitted). Such wrongfulness may be shown by proving that the defendant used an improper means or had an improper purpose. If liability is shown by improper means, "then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Nw. Nat. Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498 (1994). If liability is shown by an improper purpose, "then the purpose must be to inflict injury on the plaintiff 'as such.'" *Id.* (quotation omitted). "Generally, a defendant's subjective judgment as to its own business purposes will control." *Id.*

As previously stated, the Court finds that there is a genuine dispute regarding whether ScholarChip misappropriated UAS's trade secrets. If proven, such misappropriation would

satisfy the requirement of "improper means" for UAS's claim of intentional interference. In addition, UAS has offered evidence of other conduct by ScholarChip that could lead a rational trier of fact to find that ScholarChip's subjective purpose was to inflict injury on UAS. For example, ScholarChip's founder and CTO, Dr. Atiya, telephoned Schulton after Schulton left ScholarChip to ask whether Schulton "had any interest" in receiving the eUAS source code. It is at least a rational inference from this statement, albeit not the only possible explanation, that ScholarChip wanted to inflict injury on UAS by assisting Schulton in competing with UAS. Therefore, UAS presents a genuine dispute of material fact on this element.

   2. **Third Party**

ScholarChip argues that it is not a "third party" to UAS's relationships with its customers because UAS's contracts with its customers require ScholarChip's cooperation as a loan service provider and because ScholarChip is inextricably intertwined in UAS's relationships with UAS's customers. ScholarChip cites *Adidas America, Inc., v. Herbalife, Inc.*, 2011 WL 3359987, at *3 (D. Or. July 29, 2011). In that case, Herbalife asserted a counterclaim against Adidas for intentional interference with economic relations, and Adidas moved for summary judgment.

The situation in *Adidas* involved Herbalife's sponsorship of a particular major league soccer team. *Id.* at *1. Adidas is the sponsor of Major League Soccer, but individual teams may have additional sponsors, as long as they do not compete with Adidas. *Id.* The apparel worn by team members includes the Adidas logo and the logo of the additional sponsor. *Id.* Adidas is the sole manufacturer of Major League Soccer apparel. *Id.* Adidas printed the relevant team shirts for three years that included both its logo and Herbalife's logo and then challenged Herbalife's use of Adidas's logo. *Id.* The court found that Herbalife had breached its agreement not to use Adidas's logo on apparel. *Id.* at *3.

The court in *Adidas*, however, also noted that the tort of intentional interference with economic relations "protects the interests of a plaintiff from 'intermeddling strangers.'" *Id.* The court found that "[w]here a defendant has a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract itself or to the business relationship" and therefore is not a third party for the purposes of this tort. *Id.* The court noted that Adidas has an interest in the contract between the soccer team and Herbalife because Adidas is the sole manufacturer of the apparel for major league soccer and thus its cooperation is required in order for the contract to be completed, as was demonstrated by the three years it printed the jerseys. *Id.* at *4. The court also found that Adidas had an interest because of its separate agreement with Herbalife that Herbalife would not use Adidas's logo on sports apparel and Adidas had a legitimate interest in Herbalife's use of Adidas's logo. *Id.* Based on these findings, the court in *Adidas* concluded that Adidas "possesses both an 'economic' and 'social' interest in the scope and performance of Herbalife's contract, eliminating the possibility that it is a third party to the economic relationship." *Id.* ScholarChip similarly asserts that it is not a stranger to UAS's relationships with UAS's customers.

Unlike the relationship between Adidas and Herbalife, ScholarChip does not have trademark rights used by UAS or its customers. ScholarChip also is not essential to UAS performing its services for its customers; UAS can find another technology provider or hire in-house programmers. The fact that ScholarChip currently provides services by contract to UAS that UAS uses in performing its contracts with its customers does not give ScholarChip an economic and social interest in UAS's contracts, especially in light of the fact that ScholarChip, or at least its former employee Schulton, has indicated an interest in competing with UAS for those customers. Accordingly, *Adidas* is distinguishable and not applicable to UAS's lawsuit.

UAS also responds that the facts in this case are more analogous to *Eusterman v. Northwest Permanente, P.C.*, 204 Or. App. 224, 237-38 (2006). In *Eusterman*, the Oregon Court of Appeals considered "whether Kaiser was a third party who could be liable for interference between plaintiff" and plaintiff's former employer. *Id.* at 220. In *Eusterman*, the Court of Appeals noted that "Kaiser simply has a contract with Northwest for provision of all medical services that Kaiser requires. The mere presence of such a contract and some shared interests does not transform the contracting parties into essentially a single entity for purposes of an intentional interference claim." *Id.* at 237. *Eusterman*, therefore, rejected Kaiser's argument that it was not, as a matter of law, a third party to the relationship between plaintiff and Northwest.

Viewing the facts in the light most favorable to UAS, the Court holds that a rational trier of fact could determine that ScholarChip was a third party to UAS's relationships with its customers. The mere presence of the Agreements between ScholarChip and UAS, even with somewhat overlapping interests, does not transform these two parties into a single entity for purposes of UAS's claim of intentional interference with economic relations. There is, therefore, a genuine dispute regarding the requirement of a third party in UAS's third claim.

3. **Damage**

Finally, ScholarChip argues that UAS has failed to present any evidence that ScholarChip caused damage to UAS. UAS responds that "ScholarChip's efforts have, to date, harmed UAS's reputation and good will with its existing clients, driven away two newly engaged clients (Northwestern and Harvard) that wanted to onboard to eUAS, and caused corresponding monetary damages." As evidence, UAS presents an email dated May 24, 2016, that UAS's General Manager Joel Petersen sent to ScholarChip's founder and CTO, Dr. Atiya. ECF 151-21. In this email, Petersen requests an "interim extension" of development work by ScholarChip. UAS's Petersen states to ScholarChip's Dr. Atiya:

PAGE 16 – OPINION AND ORDER

> We have experienced friction and disruption because new development work is on hold. One example is Harvard. While acknowledging that Harvard is particularly complex and the work to date has been cumbersome, a hold on further development puts put [*sic*] this relationship in jeopardy. While Harvard is one of the more noteworthy clients, the impact of the development hold is wide ranging, ultimately impacting a [*sic*] numerous other clients. In the near term this has a high probability of causing serious relationship issues, including but not limited to a severe deterioration in future revenue.

ECF 151-21 at 2.

The following day, Dr. Atiya forwarded this email to Schulton, who promptly replied that "we should not budge on the development freeze—it is the full source of our power and the best way to legally apply significant pressure." *Id.* Dr. Atiya responded to Schulton by stating that Dr. Atiya agreed. *Id.* at 1. Harvard University later terminated its contract with UAS. ECF 151-24 at 4. ScholarChip contends that Harvard decided not to convert to eUAS for reasons other than ScholarChip's actions, but viewed in the light most favorable to UAS, as the non-moving party, there is a material dispute of fact regarding this issue. There is, therefore, a genuine dispute regarding damage in UAS's third claim. ScholarChip's motion for summary judgment against UAS's claim alleging intentional interference with economic relations is denied.

## CONCLUSION

Defendant ScholarChip Card, LLC's Motion for Summary Judgment (ECF 126) is DENIED.

**IT IS SO ORDERED.**

DATED this 10th day of June, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge