# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNIVERSITY ACCOUNTING SERVICE, LLC, | Case No. 3:18-cv-1486-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| ETHAN SCHULTON and SCHOLARCHIP CARD, LLC, | |
| Defendants. | |

Allyson B. Baker, Sameer P. Sheikh, Erin Z. Cass, Meredith L. Boylan, and Michael J. Marusak, VENABLE LLP, 600 Massachusetts Avenue, NW, Washington, DC 20001; Ciaran P.A. Connelly, BALL JANIK LLP, 101 SW Main Street, Suite 1100, Portland, OR 97204. Of Attorneys for Plaintiff.

Scott R. Ast, SCHARNHORST AST KENNARD GRIFFIN PC, 1100 Walnut Street, Suite 1950, Kansas City, MO 64106; Stephen P. Yoshida and Michael J. Farrell, MB LAW GROUP LLP, 117 Taylor Street, Suite 200, Portland, OR 97204. Of Attorneys for Defendant Ethan Schulton.

Stephen Nakamura, MERLE BROWN & NAKAMURA PC, 90 Broad Street, Suite 2201, New York, NY 10004; John C. Rothermich, K&L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97258; G. William Shaw, K&L GATES LLP, 925 Fourth Avenue, Suite 2900, Seattle, WA 98104. Of Attorneys for Defendant ScholarChip Card, LLC.

**Michael H. Simon, District Judge.**

In this lawsuit, Plaintiff University Accounting Service, LLC ("UAS") asserts claims

against Defendants Ethan Schulton ("Schulton") and ScholarChip Card, LLC ("ScholarChip").

PAGE 1 – OPINION AND ORDER

Against both Schulton and ScholarChip, UAS alleges misappropriation of trade secrets and intentional interference with business relations. For those claims, UAS seeks money damages and equitable relief. UAS also alleges that ScholarChip is liable for breach of contract. For that claim, UAS seeks only an equitable remedy, asking for both prohibitory and mandatory injunctive relief. After a nine-day trial, the jury returned its verdict in favor of both Defendants, rejecting UAS's claims of misappropriation of trade secrets and intentional interference. The Court must now decide whether ScholarChip breached its contract with UAS and, if so, what is the appropriate equitable remedy.

UAS's breach of contract claim is relatively narrow. In May 2016, UAS and ScholarChip negotiated and entered into three agreements (the "Covered Agreements" or simply the "Agreements") that include restrictive covenants and other confidentiality provisions that prohibit ScholarChip from using or disclosing what the Agreements refer to as "Client Data" and "Confidential Information," except to individuals within UAS or ScholarChip and only for the purpose of performing the activities described in the Agreements. Complaint, ¶ 71 (ECF 1). UAS alleges that between May 2016 and the commencement of this lawsuit, ScholarChip breached the terms of these restrictive covenants and other confidentiality provisions. *Id*. at ¶¶ 72-75. This Opinion and Order finds facts and reaches conclusions of law to resolve UAS's breach of contract claim against ScholarChip. In addition, after the jury returned its verdict in favor of Defendants, UAS renewed its motion for terminating spoliation sanctions against ScholarChip. ECF 312. This Opinion and Order addresses that motion as well.

## EVIDENTIARY ISSUES

UAS and ScholarChip agree that the Court, in resolving UAS's breach of contract claim, may consider all testimony and exhibits received in evidence during the jury trial. In addition, the Court gave UAS and ScholarChip leave to offer additional evidence relevant to the breach of

contract claim that previously was not offered at trial. ScholarChip submitted 41 additional exhibits. UAS objected to all new exhibits as irrelevant.

UAS's relevance objections divide into three categories. First, UAS objected to documents that predate 2016, the year when the underlying Agreements were formed. UAS argued that any exhibits that predate the parties' Agreements are irrelevant. In general, the Court agrees with UAS. To the extent, however, that a document that predates the parties' Agreements provides relevant context or background, the Court allowed the parties to make that argument in their posttrial written submissions and explained that the Court would give any such document the weight that it deserves. ECF 311.

Second, UAS objected to documents that postdate the filing of this lawsuit on August 10, 2018. UAS argued that any exhibits that postdate the filing of this lawsuit are irrelevant. In general, the Court agrees with UAS. To the extent, however, that a document that postdates the commencement of this action provides relevant information, the Court allowed the parties to make that argument in their posttrial written submissions and explained that the Court would give any such document the weight that it deserves. The Court also noted that documents that postdate the filing of a lawsuit may have been created to try influence the outcome of the lawsuit and thus should be viewed with skepticism. *Id*.

Third, UAS objected to documents that expressly relate only to policies and procedures specific to Payment Card Industry ("PCI") compliance or to the confidentiality of payment information. UAS argued that PCI compliance and the confidentiality of payment information are not at issue in this lawsuit, which concerns only ScholarChip's obligations to maintain the confidentiality of UAS's "Client Data" and "Confidential Information," as those terms are defined in the Agreements. In general, the Court agrees with UAS. To the extent, however, that a

document that relates to PCI compliance or the confidentiality of payment information provides relevant context or background, especially if it was created before the commencement of this lawsuit, the Court allowed the parties to make that argument in their posttrial written submissions and explained that the Court would give any such document the weight that it deserves. *Id*.

The facts that are in dispute on which the Court relies in reaching its conclusions are supported by the record. Unless otherwise noted, when evidence is subject to an evidentiary objection and the Court has relied on that evidence, the Court has overruled the evidentiary objection for the reason or reasons identified either by the Court or, if the Court is silent, by the party offering the evidence in response to the other side's objection. When the Court has declined to consider evidence subject to an objection, the Court typically will state its basis for sustaining the evidentiary objection. All other objections to evidence that the Court has not relied on or cited in this Opinion and Order are denied as moot.

After reviewing the evidence, the parties' objections to the evidence, and the parties' pretrial and posttrial submissions, the Court makes the following findings of fact and conclusions of law, under Rule 52(a) of the Federal Rules of Civil Procedure. As discussed below, when the Court finds a fact adverse to ScholarChip and that fact is material to the Court's decision on equitable relief, the Court makes that finding by clear and convincing evidence. Any finding of fact that constitutes a conclusion of law is adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is adopted as a finding of fact.

## FINDINGS OF FACT

1.      UAS is a student loan servicing company and wholly owned subsidiary of Transworld Systems, Inc. ("TSI"), a debt collection and receivables management company. UAS has been in business for more than 50 years. The clients or customers of UAS are lenders who

provide student loans. They are primarily colleges, universities, and private lenders. UAS assists

its customers by: (a) documenting when student loan payments are made to lenders; (b) ensuring

that loan balances are accurately tracked; and (c) maintaining loan documents for retrieval and

later use.

      2.      ScholarChip is a technology company that provides software development and

data security services. Dr. Maged Atiya ("Dr. Atiya") founded ScholarChip in 2000 and is its

Chief Technology Officer. UAS is ScholarChip's only client for loan servicing. Schulton worked

for ScholarChip from 2003 through the end of 2017, when he resigned to pursue other activities.

At the time of his resignation, Schulton was one of the leading software developers at

ScholarChip.

      3.      In May 2006, UAS entered into three contracts with ScholarChip, referred to as

the "Covered Agreements" or, simply, the "Agreements." They are: (1) the Master Terms and

Conditions ("MTC"); (2) the Software Development Agreement ("SDA"); and (3) the Hosting

Support Services Agreement ("HSSA"). Under the Agreements, UAS hired ScholarChip to build

for UAS a unique, proprietary software platform ("eUAS Software") and to host data provided to

or accessed by ScholarChip for the benefit of UAS and its customers ("Client Data"). The MTC

is Trial Exhibit ("Ex.") 1, the SDA is Ex. 2, and the HSSA is Ex. 3. Most relevant to this lawsuit

is Section 8 of the MTC. That section is titled "Confidentiality and Non-Disclosure Obligations."

      4.      Section 8.1 of the MTC, is titled "Client Data and Other Protected Personal

Information." It provides, in relevant part:

> "Client Data" means all data and information provided to or
> accessed by ScholarChip, including but not limited to all reports
> provided by ScholarChip concerning the Services, [such as
> hosting, maintenance and support services performed for UAS
> under the terms of the HSSA]. . . . ScholarChip agrees to maintain
> any Client Data as confidential and not use or disclose it to others

> throughout the term of the Covered Agreements, and continuing
> beyond its termination or expiration, except to its employees on a
> need-to-know basis for purposes of performing Services for Client
> in connection with the Software or the Covered Agreements.

Ex. 1 (MTC), § 8.1; *see also* Ex. 1 (MTC), at 1 (defining "Services" and "Software").

   5.    Section 8.2 of the MTC, is titled "Confidential Information." It provides, in

relevant part:

> "Confidential Information" means any confidential and trade secret
> information of Client [UAS] or ScholarChip, whether or not
> marked or labeled as "Confidential" or "Proprietary", and received
> by the other party in connection with any of the Covered
> Agreements . . . and any information received by ScholarChip in
> connection with the Covered Agreements, whether disclosed by
> Client or any Affiliates, . . . including but not limited to: software,
> financial or operational data, . . . Client's customer lists, customer
> and supplier identities and characteristics, agreements, marketing
> knowledge and information, sales figures, operations, strategies,
> forecasts, analyses, financial information, . . . and any other
> information of Client stored or created on any media or in any
> form and received, processed, stored, archived or maintained by
> ScholarChip under the Covered Agreements. "Client Confidential
> Information" also includes all Work Product and all analyses,
> compilations, forecasts, schedules, studies or other notes or
> documents prepared by or on behalf of ScholarChip that contain or
> reflect, or are generated from, any other Client Confidential
> Information, the Services or any Work Product under the Covered
> Agreements.

Ex. 1 (MTC), § 8.2

   6.    Section 8.3 of the MTC, is titled "Non-Disclosure and Non-Use Obligations." It

provides:

> Each party agrees that it shall regard, treat and preserve as
> confidential and shall not disclose the other party's Confidential
> Information or Client Data other than to persons in its organization
> who have a need to know for purposes of performing the Covered
> Agreements or for a purpose consistent with the terms of the
> Covered Agreements, and then only pursuant to an agreement that
> such persons will maintain the Confidential Information or Client
> Data in confidence and will not use or disclose to others except in
> accordance with this paragraph. ScholarChip shall use Client

> Confidential Information or Client Data solely for the purpose of performing its obligations under the Covered Agreements. ScholarChip shall exercise at least the same degree of care to safeguard the confidentiality of Client's Confidential Information or Client Data as it does to safeguard its own proprietary confidential information, but not less than a reasonable degree of care. The obligations under this Section shall continue in effect after the termination or expiration of the Covered Agreements.

Ex. 1 (MTC), § 8.3.

7.    Section 8.4 of the MTC, is titled "Obligation to Bind Employees and Contractors." It provides:

> Each party agrees it shall take appropriate action, by instruction to or agreement with its employees and by written agreement with permitted subcontractors, to maintain the confidentiality of the Confidential Information or Client Data and to use it solely for purposes permitted under the Covered Agreements. Each party shall exercise reasonable efforts promptly to notify the other party in the event that a party learns of unauthorized release of the other party's Confidential Information or Client Data.

Ex. 1 (MTC), § 8.4.

8.    Section 8.5 of the MTC, is titled "Exceptions to Confidential Information." It provides, in relevant part:

> Except with respect to Client Data, and other personal information and data which ScholarChip agrees to always hold in strict trust and confidence in accordance with the Covered Agreements and all applicable laws and regulations and not to use except to perform its obligations to Client hereunder, the following shall not be considered Confidential Information and neither party shall be required to maintain in confidence any of the following:
>
> a.    Confidential Information that is or becomes available to the general public other than by breach of the receiving party's obligations of confidentiality;
>
> b.    Confidential Information rightfully known to the receiving party without a breach of the confidentiality obligations set out in these Master Terms and Conditions;

> c.  Confidential Information independently developed by the receiving party without reference to the other party's Confidential Information as evidenced in a clear and convincing manner by contemporaneous documents.

Ex. 1 (MTC), § 8.5.

9.  Section 8.6 of the MTC, is titled "Return of Confidential Information." It

provides, in relevant part:

> Upon the termination of the Covered Agreements, the parties shall ([i]) immediately cease to use the other party's Confidential Information or Client Data . . .; (ii) return to each other such of the other party's Confidential Information or Client Data and all copies thereof within ten (10) days of the termination, and (iii) upon request, certify in writing to disclosing party that it has complied with its obligations set forth in this Section unless otherwise provided in the Covered Agreements. Notwithstanding the foregoing, nothing in this provision shall require Client to cease use of or return the Software or any Documentation, Deliverables or materials necessary or useful in operating the Software.

Ex. 1 (MTC), § 8.6.

10.  Section 8.7 of the MTC, is titled "Injunctive Relief." It provides:

> Both parties acknowledge that monetary remedies may be inadequate to protect each party's Confidential Information or Client Data and that, in addition to legal remedies otherwise available, injunctive relief is an appropriate judicial remedy to protect such rights.

Ex. 1 (MTC), § 8.7.

11.  Section 11.7 of the MTC, is titled "Survival of Terms." It provides, in relevant

part:

> The obligations of the parties under the Master Terms and Conditions which shall survive any termination: . . . Section 8 Confidentiality and Non-Disclosure Obligations, in its entirety[.]

Ex. 1 (MTC), § 11.7.

12.     Section 13.2 of the MTC, is titled "Governing Law; Severability; Legal Fees." It provides, in relevant part:

> The validity, construction and performance of the Covered Agreements and the legal relations among the parties thereto shall be governed by and construed in accordance with the laws of the State of Missouri without regard to its conflict of laws rules and principles.

Ex. 1 (MTC), § 13.2.

13.     The SDA expired by its own terms in May 2009. Ex. 2, § 2. The HSSA expired by its own terms in May 2011. Ex. 3, § 3.1. Upon expiration of the HSSA in May 2011, the parties began negotiating updated versions of the HSSA and SDA, as well as an interim pricing agreement that would have extended pricing through December 31, 2016. Ultimately, UAS and ScholarChip did not enter into any updated formal agreements. ScholarChip, however, continued to provide services to UAS under a series of interim pricing agreements. The first interim pricing agreement began on August 5, 2011. The last interim pricing agreement expired on December 31, 2015. After the last interim pricing agreement expired, there have been no written agreements reached between UAS and ScholarChip, but ScholarChip has continued to provide services to UAS.

14.     Schulton was the lead software developer and chief architect of the eUAS Software. Schulton began working on eUAS in 2005 and continued until his departure from ScholarChip at the end of 2017. Schulton's brothers, Bric and Seth Schultz, also worked for ScholarChip and assisted in developing eUAS. Schulton and his brothers worked next to each other for several years in ScholarChip's office in Portland, Oregon, until Schulton left ScholarChip at the end of 2017. Bric Schultz left ScholarChip at the end of 2018.

15.     Schulton's responsibilities included the coding, development, and maintenance of the eUAS Software, as well as ensuring the security and safekeeping of UAS's Client Data.

Schulton was UAS's primary contact at ScholarChip for all technical needs, questions, and requests relating to the eUAS Software. In addition, Schulton was responsible for providing "webinars," or personalized tutorial sessions, to UAS's customers to: (a) educate UAS's customers about the features of the eUAS Software; (b) provide UAS's customers with technical support; and (c) answer specific questions from UAS's customers. UAS entrusted ScholarChip, and its employees, including Schulton, with access to UAS's Client Data and UAS's Confidential Information, including UAS customer lists, customer preferences, and other customer-specific intelligence that Schulton was exposed to while providing eUAS webinars.

16.     UAS never authorized ScholarChip to conduct research using the eUAS system. UAS also never authorized ScholarChip to use UAS's Confidential Information in a way that does not directly involve the eUAS system.

17.     In 2013, Dr. Atiya negotiated a contract with Craig Lockwood ("Lockwood"), Chief Executive Officer of Tuition Management Systems ("TMS"), a tuition payment services company. Under this contract, ScholarChip would provide services for TMS related to certain tax documents called "1098-T forms." As a prerequisite to signing that agreement, ScholarChip provided a list of "protected clients" to TMS. This list was comprised mostly of UAS's customers. In its contract with ScholarChip, TMS agreed not to solicit the customers shown on this list for 1098-T services. There were no other limitations, however, placed on TMS regarding what it could do with this list. TMS is owned by Nelnet, one of the largest servicers in the business of student lending, and Nelnet is a direct competitor of UAS. After entering into this contract, TMS paid ScholarChip approximately $50,000 a year for its 1098-T servicing work. Lockwood left TMS in November 2017, when he became the President and Chief Financial Officer of ScholarChip. Dr. Atiya testified that before disclosing the list of "protected clients" to

TMS, Dr. Atiya showed the list to UAS's then-Chief Operating Officer, Natalie Girmschied, who did not object to Dr. Atiya showing this list to TMS, even though it contained the names of UAS's customers. There are no written communications that corroborate this testimony by Dr. Atiya, but UAS did not call Ms. Girmschied as a witness to rebut Dr. Atiya.

18.     Throughout 2016, ScholarChip and TMS began extending their business relationship into areas beyond 1098-T servicing. In July 2016, Lockwood contacted Dr. Atiya about offering a loan workout program to Miami University, then a TMS client (and previously a UAS client). As Lockwood explained, TMS did not possess the technology to support the needs of Miami University. The loans involved in the loan workout program were interest-bearing and involved promissory notes, although a loan workout plan is not the same thing as a student loan. Dr. Atiya asked Schulton to see whether ScholarChip could "do it technically," and Schulton said that he would investigate. Between December 2016 and January 2017, Schulton worked to create a "clone" of eUAS, called "LoanServ," to research whether ScholarChip could support the request from Miami University. The act of cloning the eUAS Software involved taking the eUAS database structure and source code, creating a copy, and then tweaking that copy. On January 26, 2017, Schulton announced that the clone was complete and ready to be demonstrated to Lockwood. ScholarChip, however, ultimately chose not to continue the arrangement with Miami University because, as Dr. Atiya testified, doing this business with Miami University offered insufficient revenue to ScholarChip.

19.     In February 2016, ScholarChip told UAS that UAS would have to pay substantially higher fees if it wanted to continue using the eUAS Software platform. Otherwise, ScholarChip would terminate UAS's access to eUAS. In March 2016, Schulton recognized the possibility that UAS might bring a lawsuit. On March 29, 2016, Schulton sent an email to

Dr. Atiya stating, among other things: "To ensure UAS/TSI has no fuel for a lawsuit, should we provide them with the source code now?" During the following month, April 2016, Schulton sent an email to his own legal counsel and copied others within ScholarChip. In that email, Schulton asked about forming a new legal entity to be called "Online Financial Management Technologies, LLC."

20. In February 2017, UAS met with Dr. Atiya and others at ScholarChip. UAS told Dr. Atiya that UAS had identified an alternative platform and intended to move, or migrate, its Client Data away from ScholarChip and off eUAS. ScholarChip demanded from UAS a significant increase in fees for allowing UAS to migrate its Client Data away from ScholarChip. In March 2017, Schulton declined a request from UAS to perform certain software development work relating to eUAS. Schulton told UAS that the requested modifications and other work were no longer available to UAS. In June 2017, ScholarChip limited UAS's access to the eUAS Software by terminating UAS's access to a development and test "environment" that UAS contends is necessary for UAS to test features and ensure the eUAS system is functioning properly for UAS's customers.

21. On February 21, 2017, twelve days after UAS had informed ScholarChip that UAS intended to cease using ScholarChip's services, Schulton sent an email to Dr. Atiya and Schulton's brothers, Bric and Seth Schultz. The email was titled "PostgreSQL as a possible replacement for Oracle." The database underlying eUAS was an Oracle database; Schulton was proposing that PostgreSQL might serve as an alternative database to Oracle for eUAS. In April 2017, ScholarChip authorized Schulton to begin performing research regarding the use of a PostgreSQL database instead of an Oracle database. On April 12, 2017, hours after UAS had sent a proposed "Technology Transition Plan" to ScholarChip, Schulton sent an email to Dr. Atiya,

asking for approval to download Ubuntu/Linux (an operating system) and PostgreSQL (an open source database) onto a standalone server maintained by ScholarChip known as "SC6PRODB." Dr. Atiya approved Schulton's request. On April 13, 2017, Schulton began working on SC6PRODB. At about this time, Dr. Atiya told Schulton that ScholarChip was intending to "mothball" the eUAS system and that if Schulton "want[ed] to retool and kind of revamp his technology tool set, he could just name whatever he want[ed] to work on, and ScholarChip would support him in that education."

22.    On May 16, 2017, Schulton sent an email to Dr. Atiya, informing him that he believed UAS was attempting to migrate its customer College Avenue Student Loans ("CASL") by pulling data down from a function in eUAS called "web services." Schulton wrote: "I believe UAS is moving to "deconvert CASL to their new system first. The real fight ahead will involve our ability to prevent individual clients like CASL from deconverting. Unless we stop web services, we may not be able to prevent such deconversions." Dr. Atiya approved Schulton's proposal to implement a "data cap" on the web services functionality in eUAS. Schulton implemented the changes into production the following day, noting for Dr. Atiya that he expected UAS to "complain first thing in the morning." Schulton took this action in part because of concerns ScholarChip had with UAS excluding ScholarChip from the data migration process.

23.    In June 2017, UAS filed a lawsuit against ScholarChip in federal court in Wisconsin. In October 2017, that court dismissed the action for lack of personal jurisdiction over ScholarChip, a New York-based company. Shortly thereafter, ScholarChip filed a complaint against UAS in federal court in New York. *ScholarChip Card, LLC v. Transworld Systems, Inc., et al.*, Case No. 2:17-cv-06296-NGG-SIL (E.D.N.Y.). In that lawsuit, ScholarChip alleged that UAS failed to make certain payments for work that ScholarChip asserts it performed. According

to ScholarChip, UAS's failure to make these payments meant that ScholarChip, and not UAS, owns eUAS. UAS disputes ScholarChip's allegations and asserts counterclaims against ScholarChip. That litigation is continuing in federal court in New York.

24.    Hundreds of thousands of files were added to and modified on the SC6PRODB standalone server at ScholarChip between July 1, 2017 and September 1, 2017. Also, more than a hundred files were deleted from that server in August 2017.

25.    On September 1, 2017, Schulton sent an email to Dr. Atiya, stating that Schulton wanted to leave ScholarChip by the end of December 2017. All significant activity on the SC6PRODB server ceased that day. On September 6, 2017, Schulton sent another email to Dr. Atiya, following up on their conversation from earlier that day and stating that Schulton anticipated becoming either "an entrepreneur or a freelancer." As Schulton testified in his deposition, in September 2017 he used a "mechanism called Take Out" to export his entire ScholarChip email account, which included all contents dating back to 2014, to Schulton's personal cloud storage account, sometimes referred to as a "One Drive" account and sometimes referred to as a personal "DropBox" account. Schulton also saved a copy of his ScholarChip email account on his personal laptop computer. According to Schulton, "that extraction process took several days, and it produced an Inbox file, a very, very large Inbox file."

26.    In mid-September 2017, ScholarChip was involved in document discovery in the Wisconsin lawsuit. That same month, Schulton initiated a "Google Takeout" of his ScholarChip email account, pulling a "full dump" of three years' worth of emails to his personal computer. The Google Takeout action took "a couple of days to process" and "result[ed] in a several gigabyte file."

27.    In the fall of 2017, during his final months as an employee of ScholarChip, Schulton conducted recorded webinars directly with UAS clients, but no representatives from UAS were in attendance. During these webinars, UAS's clients described "the functionality they want built" and Schulton "would demo the functionality that we were building for clients." As Schulton explained, "[i]t was a venue to both demo and gain information about what [UAS's] clients needed." Schulton saved electronic copies of these webinars to his personal laptop computer, which he took with him and kept after he left ScholarChip in December 2017.

28.    Between December 22 and December 27, 2017, several PostgreSQL-related files were modified on ScholarChip's SC6PRODB server, representing the first significant activity on the server since September 2017. Schulton's last day at ScholarChip was December 29, 2017. Schulton did not sign any non-competition or non-solicitation agreements with ScholarChip.

29.    On February 1, 2018, ScholarChip asked Schulton to fill out a "departing employee questionnaire," which requested that he respond to certain questions and give certain confirmations, including the following:

●    As an employee of ScholarChip, you entered into certain agreements regarding the protection of ScholarChip confidential information. Do you understand these agreements and any continuing obligations you may have under them?

●    I confirm that I have returned or made arrangements to return, any and all company [ScholarChip] property in my possession or control (such as at home, or on a personal computer or mobile device.).

Schulton answered "Yes" to both, confirming that he had returned all of ScholarChip's information and ScholarChip's property to ScholarChip. The questionnaire did not ask whether Schulton had taken any of UAS's Confidential Information or Client Data upon his departure. Upon and after Schulton's departure, ScholarChip also did not make any attempt to inspect Schulton's personal laptop computer to ensure that he had no UAS Confidential Information or

Client Data, even though ScholarChip knew that during Schulton's years at ScholarChip, he had worked "extensively" from home and used his personal laptop for work purposes, rather than using a ScholarChip-issued laptop when working from home.

30.     As part of ScholarChip's lawsuit against UAS in federal court in New York, the parties conducted discovery relating to ScholarChip's claims and UAS's counterclaims. In February and March 2018, ScholarChip and UAS served third-party deposition and document subpoenas in that matter, including a third-party subpoena that UAS served on Schulton. On March 7, 2018, Schulton accepted service of that subpoena from UAS in the New York case. The subpoena called for production of responsive documents, including "all DOCUMENTS and ESI in YOUR possession, custody or control, irrespective of their physical location or whether such DOCUMENTS or ESI or other materials are possessed directly by YOU, YOUR attorneys, agents, employees, representatives, or investigators." These requests to Schulton demanded communications, documents, and things that he had relating to the eUAS Software or UAS's Client Data.

31.     As Schulton testified at trial, on March 8, 2018, the day after Schulton received UAS's subpoena for documents, Dr. Atiya instructed Schulton *not* to provide any documents in response to UAS's subpoena. Dr. Atiya told Schulton that Schulton need not produce anything because "ScholarChip already produced such documents." Dr. Atiya gave sent these instructions to Schulton in an email that reads, in relevant part: "You will need NOT to produce any of the documents they [UAS] requested since ScholarChip produced such documents on your behalf." Ex. 153.

32.     On July 30, 2018, Schulton responded to UAS's document subpoena as follows:

> I left ScholarChip with nothing but the knowledge gained over 15 years of employment. To use definitions from my recent document

subpoena, I have no "CLIENT DATA," "DELIVERABLES," "SOFTWARE," or "WORK PRODUCT."

33.     On June 26, 2018, Schulton's brother Seth Schultz reached out to Schulton, asking whether he remembered the password to the SC6PRODB server. That day, significant activity, including modifications to certain files, occurred on the SC6PRODB server, for the first time since December 27, 2017. Schulton testified that he did not know the password to the SC6PRODB server.

34.     Two weeks later, on July 9, 2018, Dr. Atiya called Schulton, and asked him whether he had any interest in the eUAS source code. Schulton declined Dr. Atiya's offer.

35.     On July 30, 2018, approximately seven months after Schulton left ScholarChip, Schulton sent an email to both UAS and Dr. Atiya. In that email, Schulton announced his intention to create a loan servicing system that would directly compete with UAS. Schulton also said that he would create the system based on knowledge he had acquired during his 15 years at ScholarChip. Schulton added that he would be communicating with and soliciting business from UAS's customers that he learned about through his work at ScholarChip for UAS. Schulton explicitly named three such customers and individuals. These customers and individuals were previously identified on UAS's customer list as UAS's direct points of contact at each of the named customer companies. This was the same customer list that Schulton previously downloaded to his personal DropBox, or cloud, account. The subject line of Schulton's July 30th email was "some needed competition."

36.     On August 20, 2018, UAS filed this lawsuit against Schulton and ScholarChip in the District of Oregon, even though the New York case between ScholarChip and UAS was still proceeding. Among other things, UAS sought in the Oregon lawsuit a TRO against Schulton. The Court scheduled a TRO hearing for August 22, 2018.

37.     On August 21, 2018, the day before the TRO hearing in Oregon, Schulton deleted

the file known as UAS's "Private Client List," which listed UAS's clients in descending order by

ScholarChip revenue. The next day, during the TRO hearing, Schulton testified in court under

oath as follows:

> A.     I discovered yesterday morning that I did have a list of
> clients in descending order by ScholarChip revenue on a – on a –
> on my Dropbox account that I had forgotten about. That is all I'm
> aware that I took. I immediately deleted it. It was tracking
> ScholarChip clients by revenue so we knew how to prioritize
> development. I overlooked it in the early months of this year.
>
> Q.     When you left ScholarChip, did you take any code or
> information concerning the system?
>
> A.     No.

ECF 130-2. Although Schulton disclosed at the TRO hearing that he had taken this "Private

Client List" of UAS's customers ranked by revenue, Schulton failed to inform UAS and the

Court that when he left ScholarChip, he also had taken with him numerous recorded webinars

conducted with UAS's clients and at least three years' worth of emails from his time at

ScholarChip. In fact, Schulton expressly denied under oath having taken any information

concerning eUAS when he left ScholarChip.

38.     Schulton's deposition was taken in October 2018. In that deposition, Schulton

testified that he accepted service of UAS's document subpoena on March 7, 2018 and three days

later, on March 11, 2018, intentionally destroyed responsive evidence located on his personal

laptop computer and in his personal cloud storage account. Schulton did this by initiating a

"restore" of his entire personal computer, effectively "shredding" the email inbox file and

returning the entire computer to its original factory configuration. As Schulton admitted in his

deposition:

In March, a couple of days after I was provided the subpoena, the document subpoena reminded me that I had downloaded, in September, a dump of my ScholarChip e-mail, that I had extracted per Maged's [Atiya's] request, for document discovery related to the UAS versus ScholarChip case in Wisconsin.

\*   \*   \*

At any rate, on March 11th, after the subpoena had been issued, having realized that I had a dump of my ScholarChip e-mail on my laptop, and this was the second instance of ScholarChip data that I found on my laptop, and wanting to destroy any access to that data so that I could legitimately say I have no access to this e-mail, I initiated a reinstallation of the operating system.

To be specific, I used what appears to be called, in Windows 10, a restore, which reverts the laptop back to the factory defined image. And it must do some type of obfuscation or shredding of the personal files that remain on the laptop.

So when one initiates a delete, it simply deletes a pointer or reference to that file in the directory structure.·The actual raw data remains on disk, and utilities can be used to extract that data.

So in shredding the remainder of the personal files on disk, I could guarantee myself that I had no additional access to that e-mail.

Now, I recognize fully that was in violation of the subpoena, but I -- I reasoned at the time that ScholarChip already had the e-mail, and deletion was the safest path forward.·There was no reason to return the e-mail to ScholarChip, because they already had it.

\*   \*   \*

At any rate, I thought I got rid of the e-mail, but there was an Inbox file on my One Drive that still essentially had the e-mail. And I didn't discover the existence of that file until April 9th.

When I discovered the existence of that file on April 9th, I deleted and initiated a second restore on my computer, again with the rationale that I wanted to shred the existence of that Inbox file. Being a cloud account, it was synchronizing with my laptop, so I didn't realize it actually yanked the Inbox file back down and placed it on my laptop in the background via synchronization process.

But at any rate, I felt confident on April 9th that I no longer had any ScholarChip data.·That turned out to be false. The day before

PAGE 19 – OPINION AND ORDER

my TRO hearing, I -- because of the stress of the lawsuit, it ups the
-- it ups the –

I decided to do another search and walked, again, directory by
directory through my cloud accounts.·What I checked that time
was my Dropbox account, and that's where I found the -- I believe
it was a -- I found the file called 2017-01, I don't know what the –
so essentially January 2017.·I don't know the precise date that the
file was taken.

The name of the file was Private Client List, and I can't tell you
what the extension was. My best conjecture is it's a PNG file, a
screen shot.

In the TRO hearing [in the federal litigation in Oregon] I referred
to the contents of that file. And although I never opened the file, I
deleted the file as fast as I could, because I was petrified at its
existence, because it's exactly the type of damning information
that UAS wants to catch me with. The contents of the file, I
believe, came from a query parameter on the management
site.·The query parameter --

ECF 130-1 (Schulton Deposition, at Tr. 109:21-114:20).

39.     During discovery in this case, UAS requested from ScholarChip all "documents

relating to the Private Client List and Schulton's taking and destruction of his entire ScholarChip

email inbox." ScholarChip's counsel represented that ScholarChip had searched for the

documents and "could not locate any documents." ECF 157 (Second Baker Decl.), ¶ 12. UAS

then moved to compel. In response, ScholarChip represented: "The fact is that ScholarChip still

is uncertain what the 'private client list' that Mr. Schulton deleted actually was, despite its good

faith effort to determine the 'query' about which Mr. Schulton testified in his deposition."

ECF 134 at 5. Thus, the Private Client List cannot be restored or replaced through additional

discovery.

40.     Regarding Schulton's copying of ScholarChip's emails to his personal laptop

computer and cloud account before he left ScholarChip, ScholarChip states that it "has

conducted a reasonable search for documents responsive to RFP No. 28 and UAS has identified

no basis to require additional or deeper searching." *Id.* at 7.[1] Whether the missing emails and webinar recordings that Schulton copied to his personal computer and cloud account, which Schulton kept after he left ScholarChip and later destroyed, can be restored or replaced presents a more nuanced question. UAS does not contend that ScholarChip has not kept and did not produce to UAS copies of Schulton's emails or the recorded webinars that Schulton conducted. What cannot be restored or replaced, however, is the precise set of emails and webinar recordings that were taken by Schulton when he left ScholarChip.

41.     In March 2019, UAS was able to migrate its first customer from eUAS to its new system, CASL. UAS, however, has been unable to migrate all its customers and Client Data off eUAS. (As discussed below, UAS seeks mandatory injunctive relief to be able to complete this migration.)

42.     On April 1, 2019, substantial activity occurred on ScholarChip's SC6PRODB server for the first time since June 2018. In April 2019, ScholarChip data center employee Antonis Michael performed a "hard reboot," or a "dirty shutdown," of the SC6PRODB server. On May 23, 2019, during a hearing in which the Court ordered ScholarChip to produce certain information regarding the contents of the SC6PRODB server, files were irretrievably deleted from SC6PRODB while in the exclusive control of ScholarChip. On May 30, 2019, ScholarChip produced three documents to UAS and the Court purporting to show the contents and status of SC6PRODB. These documents, however, contained many inconsistencies and misstatements, including showing that the server had been "decommissioned" on April 12, 2017, the day before

---

[1] UAS's Request for Production No. 28 sought: "All documents and communications relating to Schulton's transfer of his ScholarChip email inbox onto his personal computer and removal(s) therefrom, including any documents and communications relating to Schulton's reasoning for the transfer and removal(s)." ECF 124 at 10 n.10.

Schulton began his PostgreSQL research. Dr. Atiya later admitted that the documents ScholarChip provided at the Court's request were not accurate or complete.

## CONCLUSIONS OF LAW

### A.  Overview of the UAS's Allegations and Requested Relief

UAS contends that ScholarChip breached Sections 8.3 and 8.4 of the MTC. Section 8.3 requires ScholarChip to treat and preserve as confidential and not disclose UAS's confidential Information and Client Data, other than to persons at ScholarChip who have a need to know for purposes of performing the Covered Agreements or for a purpose consistent with the terms of the Covered Agreements, and then only pursuant to an agreement that such persons will maintain the Confidential Information or Client Data in confidence. That section also requires that ScholarChip use UAS's Client Confidential Information or Client Data solely for the purpose of performing ScholarChip's obligations under the Covered Agreements and that ScholarChip will exercise at least the same degree of care to safeguard the confidentiality of UAS's Confidential Information or Client Data as it does to safeguard its own proprietary confidential information, but not less than a reasonable degree of care. Section 8.4 requires ScholarChip to take appropriate action, by instruction to or agreement with its employees, to maintain the confidentiality of the Confidential Information or Client Data and to use it solely for purposes permitted under the Covered Agreements.[2]

As UAS alleges in its Complaint (ECF 1), ScholarChip breached the terms of the restrictive covenants and confidentiality provisions in the Agreements in the following ways:

> (1) by Mr. Schulton using UAS's Confidential Information, as
> well as the eUAS Software, and components of the eUAS Software
> that are the property of UAS, to code, develop, create and/or

---

[2] Although UAS also mentions Section 8.5 of the MTC, that section does not add any further obligations to ScholarChip's duties.

maintain a competing loan servicing software platform or system (Complaint, ¶ 73);

(2) by ScholarChip failing to institute or enforce with Mr. Schulton a non-disclosure or confidentiality agreement, or other agreement preserving confidentiality and prohibiting use and disclosure of Confidential Information to third parties (Complaint, ¶ 74); and

(3) by ScholarChip's using UAS's Client Data for a purpose inconsistent with the purpose of performing ScholarChip's obligations under the Agreements, specifically by assisting, facilitating, or encouraging Mr. Schulton's ability to code, develop, create and/or maintain a competing loan servicing software platform or system (Complaint, ¶ 75).

Based on these alleged contractual breaches, UAS seeks "injunctive relief ordering ScholarChip to return to UAS the eUAS Software, including the source code and object code for the eUAS Software, any and all information UAS entrusted to ScholarChip, including the Client Data, in the requested file and table format, and at the requested transfer frequency, as necessary for UAS's purposes, including to permit UAS's transition away from ScholarChip." Complaint, at 21 (footnote omitted).

As discussed below, the Court finds it significant that UAS has *not* alleged any breach, or even any anticipatory breach, by ScholarChip of its obligations in Section 8.6 of the MTC. That section requires ScholarChip, upon the termination of the Covered Agreements, to return to UAS its Confidential Information and Client Data and all copies thereof within ten days of the termination. This will play a role in the Court's analysis of the appropriate injunctive relief.

**B.  Legal Standards**

Section 13.2 of the MTC provides that Missouri law governs the parties' Agreements. Both UAS and ScholarChip, however, agree that there are no material differences between Oregon law and Missouri law regarding relevant contract principles. ECF 328 at 8 n.3 (UAS);

ECF 316 at 9 and 25 n.19 (ScholarChip). Accordingly, the Court refers in this Opinion and Order

to Oregon contract law and, when applicable, federal law concerning injunctive relief.

When a plaintiff seeks to recover money damages for an alleged breach of contract, the

plaintiff must prove the following elements: (1) the existence of a contract; (2) the relevant

contract terms; (3) the fact that all conditions precedent have been satisfied or excused; (4) the

defendant's breach of the contract; and (5) damages caused by the breach. *See Slover v. Or. State*

*Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996); *Malot v. Hadley*, 86 Or. App. 687,

690 (1987); *see also Sharma v. Providence Health & Servs.-Oregon*, 289 Or. App. 644, 657

(2018) ("Damage is an essential element of any breach of contract action.") (quoting *Moini v.*

*Hewes*, 93 Or. App. 598, 602-603 (1988)).

When money damages are unavailable, however, a plaintiff may seek specific

performance of a contract or other appropriate equitable relief. "Specific performance is

available only if other remedies are deemed to be inadequate to protect the nonbreaching party's

contractual interests." *Kazlauskas v. Emmert*, 248 Or. App. 555, 569 (2012). Further, to obtain

specific performance, a plaintiff must prove its claim to specific performance by clear and

convincing evidence. *Murray v. Laugsand*, 179 Or. App. 291, 294 (2002).

Like a suit for an injunction, a claim for specific performance sounds in equity. *See, e.g.,*

*Ford v. Blinn*, 50 Or. App. 515, 519 (1981) (specific performance); *Mail-Well Envelope Co. v.*

*Saley*, 262 Or. 143, 147 (1972) (injunction). "Specific performance is not granted as a matter of

right; its granting must rest solely in judicial discretion, controlled by equitable principles."

*Moore v. Fritsche*, 213 Or. 103, 112-13 (1958). Additionally, "it is a well-established rule of law

in [Oregon] that equity will not decree specific performance unless the contract is definite,

certain and complete. The court cannot make a contract for the parties, nor can it make clear that

which is left in doubt and uncertainty." *Landura Corp. v. Schroeder*, 272 Or. 644, 651 (1975)

(citation and quotation marks omitted).

The federal standard for permanent injunctive relief provides:

> "To be entitled to a permanent injunction, a plaintiff must
> demonstrate: (1) actual success on the merits; (2) that it has
> suffered an irreparable injury; (3) that remedies available at law are
> inadequate; (4) that the balance of hardships justify a remedy in
> equity; and (5) that the public interest would not be disserved by a
> permanent injunction." *Indep. Training & Apprenticeship Program
> v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir.
> 2013) (citing *eBay Inc. v. MercExch., L.L.C.*, 547 U.S. 388, 391
> (2006)).

*Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019) (footnote omitted).

An order for injunctive relief can take two forms. A prohibitory injunction prohibits a

party from taking an action. *See Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see*

*also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand,

"orders a responsible party to 'take action.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996).

Although mandatory injunctions are subject to a higher standard or burden than prohibitory

injunctions in the context of a request for preliminary injunctive relief, *see Hernandez v.

Sessions*, 872 F.3d 976, 999 (9th Cir. 2017), that is not the case for a permanent injunction, when

the plaintiff has already shown actual success on the merits. *See Edmo*, 935 F.3d at 784 n.13.

## C. Actual Success on the Merits

ScholarChip does not dispute the existence of a contract with UAS, the relevant terms, or

that all conditions precedent have been satisfied or excused. *See* ECF 316 at 9. Instead,

ScholarChip primarily disputes UAS's contention that ScholarChip breached the contract.

ScholarChip also argues that even if it were to be found to have breached its contract with UAS,

the specific injunctive relief sought by UAS is unwarranted.

UAS contends that Scholarship breached Sections 8.3 and 8.4 of the MTC in four ways. First, UAS asserts that ScholarChip allowed Schulton to copy and remove UAS's Client Data and Confidential Information, or at least failed to take reasonable steps to prevent him from doing so. Second, UAS maintains that ScholarChip allowed Schulton to use UAS's Client Data and Confidential Information to conduct research on PostgreSQL that was not for the benefit of UAS. Third, UAS argues that ScholarChip "cloned" eUAS for the benefit of either ScholarChip itself or UAS's competitor TMS. Fourth, UAS maintains that in 2013 ScholarChip disclosed UAS's confidential client list to UAS's competitor TMS. The Court separately addresses these four allegations of breach. Afterwards, the Court turns to whether permanent injunctive relief is warranted based on the Court's findings and conclusions regarding ScholarChip's breaches and UAS's actual success on the merits.

### 1.  Schulton's Copying and Removal of UAS's Client Data and Confidential Information and ScholarChip's Failure to Safeguard

A corporation can act only through its officers, agents, or employees. Any action by an employee of a corporation is the act of that corporation if the act was performed within the scope of that person's authority or employment. *Thayer v. Or. Fed'n of Square Dance Clubs*, 258 Or. 302, 306-07 (1971); *see generally* RESTATEMENT (THIRD) OF AGENCY § 2.01 ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."). Schulton was the lead software developer and chief architect of the eUAS Software at ScholarChip. His responsibilities included the safekeeping of UAS's Client Data. If Schulton's copying and removal from ScholarChip of UAS's Client Data and Confidential Information was done within the scope of his authority while at ScholarChip (that is, if Schulton's actions were taken in accordance with ScholarChip's

manifestations that this is how ScholarChip wanted or authorized Schulton to act), then ScholarChip is responsible for Schulton's conduct.

In February 2017, UAS told Dr. Atiya and others at ScholarChip that UAS had identified an alternative platform and intended to move its Client Data away from ScholarChip and off eUAS. Twelve days later, Schulton sent an email to Dr. Atiya (and to Schulton's brothers), titled "PostgreSQL as a possible replacement for Oracle." The database underlying eUAS was an Oracle database. In April 2017, Dr. Atiya authorized Schulton to begin performing research regarding the use of a PostgreSQL database, instead of an Oracle database. On April 12, 2017, hours after UAS had sent its proposed "Technology Transition Plan" to ScholarChip, Schulton sent an email to Dr. Atiya, asking for approval to download Ubuntu/Linux (an operating system) and PostgreSQL (an open source database) onto a ScholarChip server known as "SC6PRODB." Dr. Atiya approved Schulton's request. On April 13, 2017, Schulton began working on the SC6PRODB server.

After UAS's recent statements of its intent to move off eUAS, there is no legitimate reason under the Agreements for ScholarChip to begin investigating PostgreSQL as a possible replacement for eUAS's use of Oracle. This leads the Court to conclude that what ScholarChip was doing with PostgreSQL and the SC6PRODB server was not for the benefit of UAS. This conclusion is further supported by the fact that ScholarChip did not discuss this issue with UAS. Further, at about this time, Dr. Atiya told Schulton that ScholarChip was intending to "mothball" the eUAS system and that if Schulton "want[ed] to retool and kind of revamp his technology tool set, he could just name whatever he want[ed] to work on, and ScholarChip would support him in that education."

In June 2017, UAS filed a lawsuit against ScholarChip in federal court in Wisconsin. Hundreds of thousands of files were added to and modified on the SC6PRODB server between July 1, 2017 and September 1, 2017. On September 1, 2017, Schulton sent an email to Dr. Atiya, stating that Schulton wanted to leave ScholarChip by the end December 2017. All significant activity on the SC6PRODB server ceased that day. On September 6, 2017, Schulton sent another email to Dr. Atiya, following up on their conversation from earlier that day and stating that Schulton anticipated becoming either "an entrepreneur or a freelancer." Schulton then exported his entire ScholarChip email account, which included all contents dating back to 2014, to Schulton's personal cloud storage account.

In mid-September 2017, ScholarChip was involved in document discovery for the Wisconsin lawsuit. That same month, Schulton copied three years' worth of ScholarChip emails onto his personal computer. In the fall of 2017, Schulton conducted recorded webinars directly with UAS clients, but no UAS representatives were in attendance. During these webinars, UAS's clients described the functionality they wanted built. Schulton saved electronic copies of these webinars to his personal laptop computer.

Schulton took his personal computer with him when he left ScholarChip in December 2017. ScholarChip never asked Schulton to confirm that he had not taken any of UAS's Confidential Information or Client Data with him upon his departure. Nor did ScholarChip inspect or even ask to inspect Schulton's personal computer.

On March 7, 2018, Schulton accepted service of a deposition and document subpoena in the New York case. That subpoena called for production by Schulton of all documents and things relating to the eUAS Software and UAS's Client Data. The next day, March 8, 2018, Dr. Atiya instructed Schulton *not to provide any documents* in response to UAS's subpoena. Dr. Atiya told

Schulton that Schulton need not produce anything because "ScholarChip already produced such documents." In fact, Dr. Atiya sent Schulton (and his brothers) an email that stated, in relevant part: "You will need NOT to produce any of the documents they [UAS] requested since ScholarChip produced such documents on your behalf." Schulton complied with Dr. Atiya's instruction, thereby denying UAS the opportunity to learn about the UAS Client Data and Confidential Information that Schulton already had taken with him when he left ScholarChip several months earlier. Further, on July 9, 2018, Dr. Atiya called Schulton, and asked him whether he had any interest in the eUAS source code. Schulton declined Dr. Atiya's offer.

The Court, as factfinder, draws the inference from Dr. Atiya's instruction to Schulton on March 8, 2018 not to provide any documents to UAS and Dr. Atiya's offer to Schulton on July 9, 2018 to have him take the eUAS source code that Dr. Atiya was aware of what Schulton had taken (and not taken) when he left ScholarChip and that Dr. Atiya did not want UAS to learn about that. The Court also draws the inference that Schulton's taking of UAS's Client Data and Confidential Information was done at least with the acquiescence, and likely with the express approval, of Dr. Atiya and ScholarChip.

On July 30, 2018, Schulton sent an email to both UAS and Dr. Atiya. In that email, Schulton announced his intention to create a loan servicing system that would directly compete with UAS. Schulton also said that he would create the system based on knowledge acquired during his 15 years at ScholarChip. Schulton added that he would be communicating with and soliciting business from UAS's customers that he learned about through his work at ScholarChip for UAS. Schulton explicitly named three such customers and individuals. These customers and individuals were previously identified on UAS's customer list as UAS's direct points of contact

at each of the named customer companies. This was the same customer list that Schulton previously downloaded to his personal cloud email account.

On August 20, 2018, UAS filed this lawsuit against ScholarChip and Schulton in the District of Oregon. Among other things, UAS sought a TRO, and the Court scheduled the TRO hearing for August 22, 2018. The day before that hearing, August 21, 2018, Schulton intentionally deleted his copy of the file known as the "Private Client List," which listed UAS's clients in descending order by ScholarChip revenue. Although Schulton admitted during the hearing that he deleted that document the day before, he failed to inform the Court that when he left ScholarChip, he had also taken with him numerous recorded webinars conducted with UAS's clients and at least three years' worth of emails from his time at ScholarChip. In fact, Schulton expressly denied under oath having taken any information concerning eUAS when he left ScholarChip. As UAS and the Court learned later in the litigation, Schulton did not provide truthful testimony at the TRO hearing, notwithstanding his having taken an oath to do so.

The Court finds the following by clear and convincing evidence and concludes:

●    Schulton, acting within the scope and authority of his employment by ScholarChip, failed: (i) to treat and preserve as confidential; (ii) to safeguard, and (iii) to use only for the purpose of performing ScholarChip's obligations under the Covered Agreements, UAS's Confidential Information and Client Data. Accordingly, ScholarChip, through the authorized actions of its employee Schulton, breached its contractual obligations to UAS as stated in Section 8.3 of the MTC.

●    In addition, ScholarChip has failed, by instruction to or agreement with, its employees to maintain the confidentiality of UAS's Confidential Information and Client Data, in breach of its contractual obligations to UAS as stated in Section 8.4 of the MTC. ScholarChip

PAGE 30 – OPINION AND ORDER

may have had such written agreements with its employees, but the Court concludes that ScholarChip did not take those agreements, especially with Schulton, seriously with respect to protecting UAS's interests.

### 2. Schulton's Use of UAS's Client Data and Confidential Information to Conduct Research on PostgreSQL

As previously discussed, on February 21, 2017, twelve days after UAS informed ScholarChip that UAS intended to cease using ScholarChip's services, Schulton sent an email to Dr. Atiya (and to Schulton's brothers, Bric and Seth Schultz), titled "PostgreSQL as a possible replacement for Oracle." The database underlying eUAS was an Oracle database. In April 2017, ScholarChip authorized Schulton to begin performing research regarding the use of a PostgreSQL database instead of an Oracle database. On April 12, 2017, hours after UAS had sent its proposed "Technology Transition Plan" to ScholarChip, Schulton sent an email to Dr. Atiya, asking for approval to download a Ubuntu/Linux operating system and PostgreSQL database onto a ScholarChip server known as "SC6PRODB." Dr. Atiya approved Schulton's request. On April 13, 2017, Schulton began working on ScholarChip's SC6PRODB server.

After UAS's recent statements of its intent to move off eUAS, there is no legitimate reason under the Agreements for ScholarChip to begin investigating PostgreSQL as a possible replacement for eUAS's use of Oracle. This leads the Court to conclude that what ScholarChip was doing with PostgreSQL and the SC6PRODB server was not for the benefit of UAS. This conclusion is further supported by the fact that ScholarChip did not discuss this issue with UAS. Further, at about this time, Dr. Atiya told Schulton that ScholarChip was intending to "mothball" the eUAS system and that if Schulton "want[ed] to retool and kind of revamp his technology tool set, he could just name whatever he want[ed] to work on, and ScholarChip would support him in

that education." Hundreds of thousands of files were added to and modified on the SC6PRODB server between July 1, 2017 and September 1, 2017.

On September 1, 2017, Schulton sent an email to Dr. Atiya, stating that Schulton wanted to leave ScholarChip by the end of December 2017. All significant activity on the SC6PRODB server ceased that day. On September 6, 2017, Schulton sent another email to Dr. Atiya, following up on their conversation from earlier that day and stating that Schulton anticipated becoming either "an entrepreneur or a freelancer." Also in September 2017, Schulton copied his entire ScholarChip email account to his personal cloud storage account and also to his personal computer.

Between December 22, 2017 and December 27, 2017, several PostgreSQL-related files were modified on the SC6PRODB server, representing the first significant activity on the server since September 2017. Schulton's last day at ScholarChip was December 29, 2017. On July 30, 2018, Schulton sent an email to both UAS and Dr. Atiya. In that email, Schulton announced his intention to create a loan servicing system that would directly compete with UAS.

On June 26, 2018, Seth Schultz reached out to Schulton, asking whether he remembered the password to the SC6PRODB server. Although Schulton testified that he did not know the password to the SC6PRODB server, that day, significant activity, including modifications to certain files, occurred on the SC6PRODB server, for the first time since December 27, 2017. The Court concludes that Schulton's testimony is not credible. The conclusion is supported by Schulton's previous misrepresentations. Two weeks later, on July 9, 2018, Dr. Atiya called Schulton and asked him whether he had any interest in the eUAS source code. Schulton declined Dr. Atiya's offer.

UAS was never able to recover the files deleted from ScholarChip's SC6PRODB server. The Court, as factfinder, nevertheless draws the inference that Schulton was using eUAS's Confidential Information and Client Data on ScholarChip's SC6PRODB server to determine whether a PostgreSQL database, rather than an Oracle database, could successfully handle the data and functionality that eUAS required. The Court also draws the inference that this work was not being performed for the benefit of UAS but instead for the benefit of Schulton's anticipated future competition with UAS, all with the knowledge and approval of Dr. Atiya and ScholarChip.

The Court finds the following by clear and convincing evidence and concludes:

●    Schulton, acting within the scope and authority of his employment by ScholarChip, failed to use UAS's Confidential Information and Client Data only for the purpose of performing ScholarChip's obligations under the Covered Agreements. Accordingly, ScholarChip, through the authorized actions of its employee Schulton, breached its contractual obligations to UAS as stated in Section 8.3 of the MTC.

●    In addition, ScholarChip has failed, by instruction to or agreement with, its employees to use UAS's Confidential Information and Client Data solely for purposes permitted under the Covered Agreements, in breach of ScholarChip's contractual obligations to UAS as stated in Section 8.4 of the MTC. ScholarChip may have had such written agreements with its employees, but the Court concludes that ScholarChip did not take those agreements, especially with Schulton, seriously with respect to protecting UAS's interests.

### 3.  ScholarChip's Cloning of eUAS for the benefit of UAS's competitor TMS

Craig Lockwood ("Lockwood") was the Chief Executive Officer of Tuition Management Systems ("TMS"), a tuition payment services company. TMS is owned by Nelnet, one of the

largest servicers in the student loan space and a direct competitor to UAS. Lockwood left TMS

in late 2017 to become the President and Chief Financial Officer of ScholarChip.

In July 2016, Lockwood contacted Dr. Atiya about working with ScholarChip to offer a

loan workout program to Miami University, then a TMS client (and previously a UAS client).

Lockwood explained that TMS wanted to work with ScholarChip on this project because TMS

did not possess the technology to support the needs of Miami University. These loan workout

programs were interest-bearing and involved promissory notes, although a workout plan is not

the same as a student loan. Dr. Atiya asked Schulton to see whether ScholarChip could "do it

technically," and Schulton said that he would investigate it. Between December 2016 and

January 2017, Schulton began working to create a "clone" of eUAS (called "LoanServ") to

support the request from Miami University. The act of "cloning" eUAS involved taking the

eUAS database structure and source code, creating a copy, and tweaking that copy. On

January 26, 2017, Schulton announced that the clone was complete, and ready to be

demonstrated to Lockwood. ScholarChip, however, ultimately chose not to continue the

arrangement with Miami University because it did not provide enough revenue to ScholarChip.

The Court concludes that none of this was for the benefit of UAS.

This incident, however, presents the question of who owns the eUAS database structure

and source code. Although neither party thoroughly briefed or argued this issue, the Court finds

circumstantial evidence in the fact that on March 29, 2016, Schulton sent an email to Dr. Atiya

stating, among other things: "To ensure UAS/TSI has no fuel for a lawsuit, should we provide

them with the source code now?" That is at least circumstantial evidence that UAS owns the

source code, which ScholarChip copied as part of its cloning of eUAS for its own purposes in

connection with the TMS and Miami University loan workout program. Thus, ScholarChip used

UAS's Client Data and Confidential Information not for the benefit of UAS and not for the purpose of performing ScholarChip's obligations under the Covered Agreements.

The Court finds the following by clear and convincing evidence and concludes:

●    Schulton, acting within the scope and authority of his employment by ScholarChip when he cloned eUAS, failed to use UAS's Confidential Information and Client Data only for the purpose of performing ScholarChip's obligations under the Covered Agreements. Accordingly, ScholarChip, through the authorized actions of its employee Schulton, breached its contractual obligations to UAS as stated in Section 8.3 of the MTC.

●    In addition, ScholarChip has failed, by instruction to or agreement with, its employees to use UAS's Confidential Information and Client Data solely for purposes permitted under the Covered Agreements, in breach of ScholarChip's contractual obligations to UAS as stated in Section 8.4 of the MTC. ScholarChip may have had such written agreements with its employees, but the Court concludes that ScholarChip did not take those agreements, especially with Schulton, seriously with respect to protecting UAS's interests.

### 4. ScholarChip's 2013 Disclosure to TMS of UAS's Client List

In 2013, Dr. Atiya negotiated a contract with Lockwood, then Chief Executive Officer of TMS. Under this contract, ScholarChip would provide services for TMS related to certain tax documents called "1098-T forms." As a prerequisite to signing that agreement, ScholarChip provided a list of "protected clients" to TMS. This list was comprised mostly of UAS's customers. In its contract with ScholarChip, TMS agreed not to solicit the customers shown on this list *for 1098-T servicing services*. There were no other limitations, however, placed on TMS regarding what it could or could not do with this list. After entering into this contract with, TMS paid ScholarChip approximately $50,000 a year for its 1098-T servicing work.

UAS contends that when ScholarChip provided the list of "protected clients" to TMS, which mostly showed UAS's customers, that was a breach of ScholarChip's contractual obligation to maintain the confidentiality of UAS's Confidential Information. At trial, however, Dr. Atiya testified that before disclosing this customer list to TMS, Dr. Atiya showed the list to UAS's then-Chief Operating Officer, Natalie Girmschied, who did not object to Dr. Atiya showing this list to TMS. UAS did not call Ms. Girmschied as a witness at trial. Thus, Dr. Atiya's testimony on this issue is unrebutted. The Court concludes that ScholarChip's disclosure in 2013 of the "protected clients" list was not a breach of ScholarChip's contractual obligations to UAS based on the consent provided by Ms. Girmschied.

**D.  Irreparable Injury and Inadequate Remedies at Law**

Although UAS has shown actual success on the merits on its breach of contract claim against ScholarChip, before the Court may enter a permanent injunction against ScholarChip, UAS must show irreparable injury and inadequate remedies at law. *Edmo*, 935 F.3d at 784. These concepts are well explained in the leading treatise in this area.

> Because injunctive relief looks to the future, and is designed to deter rather than punish, relief will be denied if the conduct has been discontinued on the ground that the dispute has become moot and does not require the court's intervention. But the court must be satisfied that there is no reasonable expectation of future injurious conduct. In this connection the Supreme Court in *United States v. Oregon State Medical Society*, [343 U.S. 326, 333 (1952),] warned the lower courts "to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." Since a court must take into consideration the likelihood of a recurrence of the problem, plaintiff need not rely solely on defendant's assurances that it will not engage in the offensive conduct at some later date.

11A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2942 (3d. ed.) (footnotes omitted). The treatise further explains:

> The legal remedy may be deemed inadequate if any one of a number of factors is present. Accordingly, if plaintiff shows that a monetary award would be speculative because the amount of damage would be difficult or impossible to measure, . . . equitable relief will be deemed appropriate. Plaintiff also may satisfy the adequacy prerequisite by demonstrating that damages would not provide adequate compensation. Illustratively, if defendant's acts pose a threat to some unique property interest, so that the injury will be irreparable and damages will not compensate for the loss of that property, the court may issue an injunction inasmuch as there is no adequate legal remedy.

*Id*. at § 2944 (footnotes omitted).

The Court begins its analysis here by noting that the parties, in the MTC, agreed at the outset of their relationship as follows:

> Both parties acknowledge that monetary remedies may be inadequate to protect each party's Confidential Information or Client Data and that, in addition to legal remedies otherwise available, injunctive relief is an appropriate judicial remedy to protect such rights.

Ex. 1 (MTC), § 8.7 (titled "Injunctive Relief"). But there is more. It is well established that disclosure of confidential information or trade secrets may constitute irreparable harm. *See, e.g., Campbell Soup Co. v. ConAgra, Inc*. 977 F.2d 86, 92 (3d Cir. 1992); *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985).

In this case, the Court cannot conclude that there is "no reasonable expectation of future injurious conduct." This is not even a situation in which ScholarChip has protested "repentance and reform." Rather, ScholarChip has denied any wrongful conduct on its part and also has denied knowing about Schulton's admitted and proven wrongful conduct. Based upon the evidence presented at trial, however, the Court finds ScholarChip's denials on these matters not credible. Accordingly, the Court has every reason to believe that ScholarChip's wrongful conduct is likely to continue if not enjoined. Further, ScholarChip's wrongful use of UAS's Confidential Information and Client Data, although constituting injury, will be exceedingly

difficult to remedy with money damages. This is because the amount of damage would likely be difficult or even impossible to measure without undue speculation. For these reasons, the Court concludes that UAS has shown irreparable injury and inadequate remedies at law.

## E.  Balance of Hardships and Public Interest

### 1.  Public Interest

Courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The "public interest" inquiry generally addresses the effect on nonparties of granting or withholding injunctive relief. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When an injunction's reach is narrow and affects only the parties with no effect on nonparties, "the public interest will be at most a neutral factor in the analysis," rather than one that favors granting or denying injunctive relief. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

In this case, granting an injunction is unlikely to affect nonparties. Indeed, denying an injunction may harm UAS's clients. Further, the public has a general interest in contracts being enforced. In addition, there is a general public interest in protecting against the misuse or disclosure of another's sensitive and proprietary information, such as UAS's Client Data and Confidential Information. *See Roederer v. Treister*, 2 F. Supp. 3d 1153, 1163 (D. Or. 2014). The Court concludes that the public interest factor in this lawsuit either supports an appropriate injunction or, at least, is neutral.

### 2.  Balance of Hardships

Turning to the balance of hardships, the Court divides its analysis into UAS's request for prohibitory relief and UAS's request for mandatory relief.

### a. UAS's Requested Prohibitory Injunctive Relief

Regarding prohibitory relief, UAS seeks as order that provides:

> A.     "UAS Data" means UAS's Client Data and Confidential Information, consisting of the eUAS System and its components, any customer lists, customer and supplier identities and characteristics, customer preferences, agreements, marketing knowledge and information, sales figures, pricing information, marketing plans and business plans, and any and all other information any and all information UAS provided ScholarChip or that ScholarChip accessed in connection with its performance under the Agreements.
>
> B.     ScholarChip is enjoined from disclosing to any third-party or using UAS Data for purposes other than those expressly provided under the Agreements.
>
> C.     ScholarChip is enjoined from competing with UAS, or facilitating or encouraging competition by a third-party with UAS. Furthermore, ScholarChip is enjoined from violating the respective confidentiality, non-competition, and non-solicitation provisions under the Agreements with UAS.
>
> D.     ScholarChip shall notify UAS in writing within five (5) days of learning of any conduct or omission, whether or not within ScholarChip's control, that violate or are contrary to any provision of subpart B or C, above.

*See* ECF 318-1 at 4 (modified).

As a general proposition, ScholarChip will suffer no undue hardship, burden, or injury from such an order. ScholarChip already is prohibited from using UAS's Client Data and Confidential Information, and that prohibition is permanent. *See* Ex. 1 (MTC), §§ 8.3 and 11.7. Although the MTC does not prohibit ScholarChip from ever competing with UAS, it would not be unreasonable to prohibit ScholarChip from competing with UAS for a relatively modest period of five years (as opposed to permanently) after the parties finally end their relationship. Moreover, Dr. Atiya stated that ScholarChip does not want to be in that business, further

reducing, if not completely eliminating, any hardship resulting from a five-year prohibition on

ScholarChip competing, assisting competition, or encouraging competition with UAS.

### b.  UAS's Requested Mandatory Injunctive Relief

UAS also requests mandatory injunctive relief. Specifically, UAS requests that the Court

appoint a special master "to oversee the final and complete migration of the Client Set Data and

Client Set Image Files, and to communicate to the Court where if the steps or processes detailed

below or determined by the Special Master are not followed." ECF 318-1 at 4. UAS also requests

that, as part of this mandatory relief, the Court set the compensation of the special master as well

as the fees that UAS will pay ScholarChip for the additional work that ScholarChip will need to

perform to accomplish the "final and complete migration" that UAS seeks to achieve by Court

order, as well as many other highly technical details for a successful data migration. *Id.* at 4-7

UAS's desire for this mandatory relief is understandable, but UAS's request goes far

beyond what the Court has legal authority to do. This is so for several reasons. First, the

ownership of at least a significant portion of the eUAS Software and other technical features at

issue in UAS's request is still being litigated by the parties in the New York lawsuit. *See*

*ScholarChip Card, LLC v. Transworld Systems, Inc., et al.*, Case No. 2:17-cv-06296-NGG-SIL

(E.D.N.Y.). That lawsuit is continuing, and one of the key unresolved issues in that action is

determining whether UAS or ScholarChip owns the eUAS Software.

Second, as the Oregon Supreme Court has explained, it is a well-established rule of law

in Oregon that "equity will not decree specific performance unless the contract is definite, certain

and complete. The court cannot make a contract for the parties, nor can it make clear that which

is left in doubt and uncertainty." *Landura*, 272 Or. at 651 (citation and quotation marks omitted).

The parties specified in Section 8.6 of the MTC what is to occur upon the termination of the

Covered Agreements. *See* Ex. 1 (MTC), § 8.6. The mandatory injunctive relief requested by

UAS goes well beyond the parties' agreement. Moreover, the MTC has not yet terminated, ScholarChip is continuing to provide services to UAS, and UAS has not alleged in this lawsuit that ScholarChip has breached, or even anticipatorily breached, its obligations under § 8.6 of the MTC. Further, the mandatory relief requested by UAS is not needed to prevent or deter any further violations by ScholarChip of its obligations under §§ 8.4 and 8.5, which is all that was at issue in the contract dispute that was the subject of the bench trial in this case. A prohibitory injunction will be enough.

Finally, the mandatory injunctive relief that UAS seeks would require "constant supervision" by the Court. At the parties' joint request, the Court appointed David Maier, Ph.D., a Professor in the Department of Computer Science at Portland State University, to serve as Special Master "for the purpose of assisting the Court and the parties to this litigation in implementing the parties' Data Transfer Agreement and Limited Release." ECF 83 at 2. The Special Master spent countless hours assisting the parties in trying to achieve essentially what UAS is now seeking through its requested mandatory injunctive relief. Notwithstanding the Special Master's expertise, knowledge, and time, the data transfer was not completed (although significant progress was made) because UAS and ScholarChip simply could not reach agreement on many unresolved disputes. Indeed, on numerous occasions, the parties requested and received conferences with the Court, in which the Special Master participated, during which one or both parties asked the Court to order a specific resolution of one or more technical disputes. The Court consistently declined to do so. None of these issues were addressed in the parties' Covered Agreements, and the Court declined to issue any pretrial order on any of these contested technical separation issues. Eventually, this effort came to an end without final a data transfer being achieved, and the parties went to trial.

As previously noted, the jury found for Schulton and ScholarChip on UAS's claims of

misappropriation of trade secrets and intentional interference with economic relations. All that

remained was for the Court to resolve UAS's claim against ScholarChip for breach of contract. If

the Court were to order the mandatory injunctive relief that UAS now seeks, that would be

contrary to the well-established law referred to by the Oregon Supreme Court in *Landura*. In

addition, UAS's request for mandatory injunctive relief would likely involve extraordinary

supervision by the Court, further making such an order inappropriate. *See Natural Res. Def.*

*Council, Inc. v. E.P.A.*, 966 F.2d 1292, 1300 (9th Cir. 1992) ("Injunctive relief may be

inappropriate where it requires constant supervision.").

### PLAINTIFF'S RENEWED MOTION FOR TERMINATING SANCTIONS

UAS previously moved for terminating (or, alternatively, lesser) sanctions based on

Schulton's spoliation of electronic evidence. ECF 129. Before trial, UAS added ScholarChip to

that motion. The Court granted in part UAS's motion for sanctions and provided the jury with a

permissive inference spoliation instruction. *See* ECF 159 (Opinion and Order). Regarding

ScholarChip, the Court instructed the jury as follows:

> You heard testimony that ScholarChip deleted certain
> electronically stored information from a computer server identified
> as "SC6PRODB." When Defendant ScholarChip allegedly deleted
> those files, litigation had already begun. Therefore, ScholarChip
> had a legal duty to preserve that information.
>
> If you find that Defendant ScholarChip deleted electronically
> stored information with the intent to deprive UAS of the use in
> litigation of electronically stored information on the computer
> server identified as SC6PRODB, you may then presume or infer
> from the loss of that information that the information was
> unfavorable to ScholarChip. This is only a permissive inference,
> however, not a mandatory one. In other words, you may, but are
> not required to, draw that conclusion, but only if you first find that
> ScholarChip acted with the intent to deprive UAS of the use in
> litigation of the lost information. If, however, you do not first find
> that ScholarChip acted with the intent to deprive UAS of the use in

> litigation of the lost information, you may not draw any inference
> at all about the content of the lost information based on the fact of
> that deletion.

ECF 296, at Final Jury Instr. 12B ("Adverse Inferences-Defendant ScholarChip Card, LLC").

UAS has renewed its motion for terminating spoliation sanctions against ScholarChip. ECF 312. UAS argues that based on the trial testimony, additional sanctions are warranted. At trial, UAS presented expert testimony relating to ScholarChip's SC6PRODB server, and ScholarChip responded with its own expert testimony. The Court expected to hear rebuttal testimony from UAS's expert witness. UAS, however, did not call its expert witness in rebuttal. Based on the conflicting expert testimony and the absence of any rebuttal expert testimony by UAS, the Court declines to revisit its prior ruling. The Court concludes that the adverse inference instruction was sufficient for the jury, and the Court has considered the same adverse inferences in finding facts relating to UAS's breach of contract claim.

## CONCLUSION

On UAS's claim against ScholarChip alleging breach of contract, the Court makes the findings of fact and conclusions of law stated in this Opinion and Order and GRANTS IN PART UAS's motion for permanent injunctive relief (ECF 318). The Court will enter a Judgment that includes the prohibitory injunctive relief described in this Opinion and Order. The Court DENIES UAS's renewed motion for terminating spoliation sanctions against ScholarChip (ECF 129 and ECF 312).

**IT IS SO ORDERED.**

DATED this 11th day of May, 2020.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge